I think we're set. Thank you, Your Honor. Good morning. I'd like to start, if it pleases the Court, with talking for a second about what this case is not about. This case is not about dissolving the majority-minority district that was created in legislation pursuant to this litigation. I've seen numerous reports that suggest that that's what this case is doing this morning and that's what this litigation is about, and it is not about that. This case is about an incorrect ruling by the district court that misinterpreted the judgment below and broadly subjugates the state to the redistricting authority of a federal court for an indeterminate amount of time. The state has implemented a durable remedy through legislation that requires a two-thirds vote of all the elected members of the Senate and House of the State of Louisiana's legislature to change. The agreement was very specific and it contemplated the prompt dismissal of the entire case once those items were achieved. Those items have all been achieved. They have long been achieved. And it was error, and it was an abuse of discretion, and it was an error of law for the district court to read out language in the judgment, in the agreement that the state made, to effectuate a broader purpose that would continue jurisdiction over this case effectively in perpetuity. So, I'd like to start with the agreement itself. The district court judge quoted the agreement in the ruling and put an ellipsis in the quote. We have agreement that consent judgments are viewed in the contractual sense, right? We do agree that they are reviewed by this court as a contract between the parties, under Louisiana law. Do you recognize the difference between a consent decree and an institutional reform decree? Yes, Judge Weiner. I think that we would agree, we would still agree this is an institutional reform case, that it is a consent judgment that arose from an institutional reform case. I think that the judgment itself and the agreement that was made is not an injunction. It's an agreement between the parties with eight subsections that are a condition upon which dismissal of the case would be based. And so under state law, those would be resolutory conditions. Once they are resolved, the case is supposed to be dismissed. So the fact that the case was, I mean, the judgment has just been in this court's, or in the district court's records, doesn't mean that there's still a case or controversy that's still pending. The one question that the judge should have asked was whether the eight items have been accomplished. And there's no dispute that those eight items have been accomplished. If you ask yourselves, what's left? But the litigation history demonstrates that just reading the papers didn't necessarily say what completion was, because from the plaintiff's standpoint, it contemplated that once Justice Ortega was there and then Justice Johnson, that she would become chief. Yet when it got to that point, King's ex, the document doesn't say that. So that ensued more litigation just to say what that checkoff meant. Had to go to court to litigate. Well, what does that mean? Does it mean she gets credit for the time of the Fourth Circuit, yada, yada, yada. My only point is that just looking at the papers seemingly didn't just make it so clear it took litigation. So the point being, it's a contract, it's a document, it says there, parties didn't agree to say, well, on X period of time, this ends, or only after 1, 2, 3, 4, this ends, et cetera. So the court attempting to read it somewhat broadly of what the parties agreed, why is that contrary to kind of what's actually happened in the case? Do you understand? I do. I do, Judge Stewart. I think, I understand that there was, and I was here for that, there was litigation in 2012 over what emoluments meant and whether Justice Johnson would become chief. And she did, in fact, under the terms of that agreement and by virtue of the decision by the court itself, under its own rules, become chief and has served very effectively in that role. And we are grateful for that. We're not here to challenge that or diminish that accomplishment or the accomplishment of this case. But that set of facts can never repeat itself again because it had to do with the timing of her ascension to the court. And now we have Justice Griffin on the court, and that particular set of facts can simply never reoccur because it had to do with when the three justices at that time had taken the bench. Okay. I didn't mean to derail you from your argument. So, you know, you can press ahead. You were responding to my question, so you can, if I derailed you from the path you took, you can resume. Your Honor, I would like to, I think, focus the court a little bit on what the standard should have been that I don't believe the district court properly applied. The district court should have closely reviewed, this court should closely review her decision for abuse of discretion, but she should have been reviewing this with the flexibility standard that is dictated by both the precedent of this court and the Supreme Court. And instead, she took that flexibility standard as permission to read it more broadly instead of reading it in light of federalism concerns. And the judgment itself dismisses our federalism concerns. It entirely dismisses the state's desire and the priority for the state to return all power promptly to the state as soon as possible in an institutional reform case. And this court has been through, I mean, almost, except for Judge Englehart, both Judge Weiner and Judge Stewart, you've been involved in the free litigation out of Texas that I think forms a significant foundation for the jurisprudence under 60B-5 on both prongs, on both the satisfying prong and where we have satisfied the elements of the judgment, and there is nothing else to do, and on the equity prong. So I think that those cases and the discussion of Horn and the discussion of Rufo make it clear that DSAG cases are not the proper foundation by which to judge this particular judgment and that the order that the district court should have followed was from the Supreme Court to respect concerns about federalism and to return power promptly to the state. The district court judge inverted that and read the agreement and the jurisprudence in a way that would retain power, effectively keeping us under preclearance in this district while we are also litigating in another district on a different case involving Supreme Court lines. No, preclearance is Section 5, we don't have that. Well, we don't have preclearance anymore. We don't have those issues. We only have Section 5 issues. Let me ask you, in the agreement it says, the relief contained in this consent judgment will ensure that the system for electing the Louisiana Supreme Court is in compliance with Section 2 of the Voting Rights Act. That's what's in the document itself, so from the state's standpoint, what does that mean? I think it means that the action items, and this court discussed that in one of the FREW cases, that the action items are what the parties negotiated to effectuate that result. That they identified these very specific things that would be done and we did those things and they hewed so closely to that agreement that they came back and amended it when the court voted. We did it. It meets the terms of this agreement. And so there isn't anything left to do because it did implement a durable remedy. Because the state constitution requires a two-thirds vote to change these lines and there's been no effort to do that. Justice Griffin is on the bench until 2030 and these lines can't be changed except by a two-thirds vote. So there is a durable remedy that is in place. All of the legislation that was submitted in the last round of redistricting maintained those lines. There might have been some tweaking. I don't remember exactly which precincts were touched, but it maintained this district. It did not go back to splitting the district. Were those proffered to the district court? Excuse me? Were those proffered to the district court? They were submitted as part of our motion for summary judgment. No, no, I'm sorry. We referred to those as an argument and told the judge that she could take judicial notice of the acts of the legislature and the pending legislation. So I think that was proper for judicial notice. There's never been any effort to undermine the remedy that was achieved here. And this court has very specifically said that the agreement has to be related back, that it must be interpreted in a way that relates back to the original complaint. And the original complaint was about the split districts. And we've been through this litigation here in Allen where the court rejected any broader view of that agreement and said, no, no, no, it doesn't deal with all the districts. It deals with this one district and it deals with splitting of the district. Because we have another case pending in the middle district. And that was litigated here in Allen where it said, no, no, no, the state's view couldn't possibly be right. Well, of course, the state's litigating position in Allen was that the district judge in the Eastern District, you know, had the consent decree and this whole embrace was within her territory. So you took a different litigating position when you went into Allen in terms of the breadth of the consent decree vis-a-vis the violation. Judge Stewart, I would characterize it as predicting what actually did happen. We predicted what we thought that judgment, how we thought the district court judge would interpret her own jurisdiction over the agreement. We had been through that litigation in 2012 where the district court judge said, no, no, I've got the power to enforce this judgment if I think there's a violation of it. So we were concerned, and I think that was reflected in all of our briefing, that we were concerned about being subjected to the oversight of two federal judges in the redistricting process when we knew we would still be subject likely to at least one. Now under this judgment, we are subjected to two. And that's a problem. I mean, we are litigating in the other case. We litigated this case and had an agreement that achieved a very durable remedy that no one can take away. The achievement will not be taken away from anyone. All right. Well, we don't have the middle district case, we've just got this one right here. Would you touch on how RUFO affects your position? I think that RUFO and Horn reaffirm the role of the federal district court judge in an is to achieve substantial justice but to return power back to the state as quickly as possible. And that is part of what I think is fundamentally wrong here. That the district court judge applied a standard in a way that retains power in the federal court instead of viewing and crediting the state's federalism concerns. And in fact, she dismissed them and said, no, no, no, we're going to keep it to ensure. And in doing that, at the end of the day, she read out the actual language in the agreement that related to why the state was entering into this bargain and what it was bargaining for. What remains to be done? There is nothing that remains to be done, Judge. That is exactly why we're here. There is nothing left to be done. And I think that the appeal begs that question. And that is the question that should have been the question that the judge asked was, what is there that's left to be done? And if the answer is that what's left to be done is to ensure that we never violate Section 2 again, first of all, this case did not get into that. It settled the case in the middle of litigation. But it would be an overbroad injunction if that were the case. And it's not an injunction. It's a judgment. It's a settlement. It does not enjoin us to never violate Section 2. That would essentially be an injunction that would tell us to never violate the law, which we must comply with. I mean, we obviously know that we need to comply with Section 2 of the Voting Rights Act, that we need to comply with the Constitution, both federal and state. And so I will, unless you have any more questions, I'll save the rest of my time for rebuttal. One of the questions that I think the district court asked was, taking your position to its fullest, was it the state's position that essentially you could go back to square one and redraw, not you, but the state, in other words, return to square one to where it was, to where District 7 was subsumed within all these other districts? And I think the answer on the record was, well, yes, because if this matter is dismissed, the legislature would be free to sort of redraft the district and that could be contemplated. That's sort of chilling, but you seem to be saying here, no, because Section 2 still applies and whatever bills were submitted don't necessarily do that. So am I misunderstanding the response? Yeah, I think that's right. I think that the question was posed in a manner that asked, is it possible? Is it possible that the legislature could come back and do something that would put us back into litigation over the same problem? It's possible. Is it likely? It is highly unlikely, and there's no indication that the legislature would ever do that or has attempted to do that in the 30 years that this agreement has been in place. The legislation that was filed in the redistricting process maintained this. It didn't attempt to split the districts again. And so I think the answer was more of a direct, literal answer. Is it possible? It is possible. It is unlikely because we are still bound, and we are bound by federal law no matter what. That's why you have to read it in light of the state is always bound to follow the law. We can't have an injunction that says, we enjoin you to follow the law. That is an overbroad injunction, and that is effectively where we would be now if this judgment is upheld. All right. All right. I appreciate you opening. You've reserved your rebuttal time. All right. First up, Ms. Aiden, is that correct? You're on behalf of the named plaintiffs? You're on behalf of the named plaintiffs? I'm plaintiffs. Correct. Okay. All right. The narrow question before this court is whether the district court abused its discretion in denying the Attorney General's motion, a motion that was based on little more than a threadbare evidentiary record. It did not. As you've heard indisputably, this is an institutional reform case. The Attorney General agreed to the consent decree's purpose and expressed terms, including its forward-looking requirements. Counsel, you say it's evidentiary, bare in the sense of evidence. Is there any dispute? Your opponent said that out of the eight items listed in the consent order, there was no dispute that they had been achieved. Are you in agreement with that? Are you arguing that there was other evidence that was needed or that these eight items have not been proven to have been accomplished? We absolutely don't agree. The state is glossing over the core purpose of the consent decree. As the district court recognized throughout the consent decree, it recognizes an obligation to ensure a compliant Section 2 district. And specifically, if you look at paragraph 8 on page 6 of the consent decree, it states the reapportionment will provide for a single-member district that is majority black and voting-age population that includes Orleans Parish in its entirety. It goes on to state expressly that the reapportionment shall be effective on January 1, 2000 and future Supreme Court elections after the effective date and shall take place in a newly reapportioned district. The expressed terms by the sophisticated party that is the Attorney General requires a district in Orleans Parish until such time as the state shows that that district is no longer necessary or presents evidence that under the first or third clause that the circumstances require it to be modified. But to be sure, they agreed to an Orleans-based district. They agreed to a specific district and they agreed to use it. So what specifically, if we were to agree with you and affirm in this case, what specifically should the state do, what should it accomplish in order to fully satisfy the consent order and declare the case to be over? As any party in any Rule 60B circumstance, it needs to present evidence. So in- Evidence of what? What is it that they have to do? What is it that the state has to do specifically? Bernie is- Aside from following the law, you know, she made the, your opponent made the argument about we can't have a consent order that simply commands that a party follow federal law. We know the Voting Rights Act is there and we have a lot of people who know how to use it, uh, thankfully, and they come to court readily. And they also have the benefit of an award of fees and costs in connection with a successful challenge. What specifically does the state have to do in order to complete this consent order and declare it to have been fully satisfied? Respectfully, the consent decree does more than require the state to follow the law. But what it has to do, it can look to Bernie or it can look to what the court required in Thomasville. Even when the parties came hat in hand and wanted to dissolve or vacate a consent decree or modify it, there had to have been evidence and that's exactly what the district court asked the state to present. Why is the state scared of presenting an adopted map that either shows that you can or cannot, um, achieve this Orleans-based district anymore and that does or does not show whether or not that district will be effective for black voters? That is the exact type of evidence that this court in Bernie required of the parties even when they wanted to get out of a consent decree or otherwise modify it. There is no map. There is no data. They came to court with a PowerPoint, with case law, with old electoral data, nothing that established that they complied with their express obligation to create these, to create a Orleans-based district and that, uh, that district would not be at risk of returning to the way it was prior to the consent decree. The court looked to the evidence that, frankly, the plaintiffs presented which showed that that district is not, um, likely to remain in place. Counsel for the Attorney General on the record said that they could start afresh as Justice Stewart, or Judge Stewart mentioned. They can start afresh. They can eviscerate the Orleans-based district if they redrew it. Uh, they have not shown an, an allegiance to Section 2 compliance more generally in other federal litigation. So there's ample evidence that this district that they agreed to, very specific boundaries that they agreed to, is at risk and the district court said, give me some confidence that if I remove this consent decree under a flexible standard, I recognize it's not meant to last in perpetuity. I recognize a consent decree such as this that is trying to eliminate pernicious racial discrimination in voting, which is an affront to all of us. I recognize that's not meant to last forever, but under Rule 60B, you agree to a framework to get out of this consent decree and whether it's under Clause 1 or Clause 3, come forward with some evidence. Don't be scared to show us that you are confident that what you agreed to is satisfied and that if we remove federal court jurisdiction, black voters won't be in the exact same position that they were in decades ago, which should be unconscious, um, intolerable for all of us. Let me ask you regarding the standard of review, would you agree that Horn overrules the Cooper decision? Um, I would agree that, um, Cooper is instructive that in an institutional reform case like this, heightened discretion, um, may be appropriate, but even if it's not appropriate, um, the court did not abuse its discretion in finding that, um, Horn as applied to Clause 3, that the court didn't satisfy its burden. Um, if you look at Horn, if you look at Cooper, all of them require the court to look at the core purpose, that is to ensure against dilution in Orleans Parish. And you balance that core purpose alongside with the evidence that, um, under Clause 3, that changed circumstance, there have been significant changed circumstances, and those, um, are narrowly tailored by whatever is being asked for, asked for by the party. And here, we have no evidence that under Clause 3, that malapportionment is an actual burden to the state. They came to court under this pretextual argument that they are hamstrung to redraw the lines or rebalance the population. They expressly agreed to an amendment in 2000 that allows them to do the very thing that they say their, their hands are tied behind their back to do. The express terms of the consent decree allow them to rebalance or redistrict the, um, district so long as they don't dilute black voting strength to the extent that, um, dilution is still operating in Orleans-based parish. So under Horne, under Cooper, under Ruffo, they haven't satisfied their burden under Clause 3. How should we understand, how should we interpret what was set forth in Allen, uh, the other case? How does that have an interplay with this case as we sit here today? It actually supports us because the court there in dicta said that the consent decree terms may have been satisfied, but it didn't find that they were, and it certainly didn't have the evidence before to make that determination. What it did seem to recognize is that there was a process, which is Rule 60B, which must, it's set up for circumstances just like this, where you have a consent decree, it has terms that are both specific and remedial, and also forward-looking, as here, and if you want to vacate it or you want to modify it, you have to make a showing. And the Fifth Circuit recognized that that hadn't been done. And that's exactly what the district court is asking the state to do. Make a showing. Come to court with a map. Come to court with data. Give us confidence that if we remove this consent decree, because it is not meant to operate in perpetuity, that black voters will not have their constitutional and statutory rights immediately, um, rescinded. Show us that it's no longer necessary. And we frankly think it's possible. On the record, we said we think it may be possible to develop a map. We think circumstances may warrant a district would change boundaries that will protect black voters, but show us. That is all that we are asking under Rule 6B. And to not require the state to make that showing would be disastrous, not only in cases like this, but in any other type of case where a consent decree with forward-looking remedies, with more than specific remedial, um, terms, where parties don't make the requisite showing, they should not get a free pass to get out of something that they expressly agreed to. What was your, what's your response to counsel opposite was saying that, uh, either maps or drawn maps? She was responding to my question about the court taking judicial notice of maps, so I Those maps, Your Honor, have not been passed by the legislature, and they were not presented in the, into the court until at a hearing, I mean at a oral argument. So the court has not had the opportunity, and Plains does not have the opportunity to assess an adopted map that the legislature is about to put into place with data that reflects whether that district can or cannot function for black voters as it is required to do under the express terms of the consent decree. And if the court, um, if the state does that, that is something that the court should scrutinize just like the Fifth Circuit did in Bernie, just like the court did in North Carolina in Thomasville. That's exactly what we're asking, um, the state to do. So what's the relief, I mean, the state is the appellant in this case. It doesn't seem that both sides agree on what the standard of review is. The state seems to make an argument, it's de novo review of the application of 60B-5, and your side is arguing it's a factual matter, it's an evidentiary matter under an abuse of discretion, right, standard. You're arguing an abuse of discretion standard, right? The, for, whether a consent decree should or should not be modified is subject to an abuse of discretion standard. Um, looking at clause one, clause three, um, there's less case law under clause one about how to apply it, but under any of the case law that's before this court, be it Dow, be it the substantial, um, compliance line of cases, the court didn't provide, the state didn't provide the evidence to satisfy it. And under clause three, where there is more case law, whether you look at Cooper, whether you look at Horn, whether you look at Rufo, whether you look at Bernie, uh, once again, under any of those cases, the state just simply failed to present forth the type of evidence to satisfy its heavy burden in cases such as this. And so we would ask that this court affirm the judgment, because it was not so unwarranted where, um, the decision that the district court made, and what the state can do is come back into court next week, next month, uh, next month, at any point in time with the case in other courts in order to vacate or even modify this consent decree. But that is not the record before this court on appeal. I think Judge Englehardt asked you if Horn overruled Cooper expressly. I'm not sure if I understand your answer. You said there was no evidence presented. What do we do with Horn? I think we can use Horn. I, I don't agree that it was overruled, um, Cooper expressly, but I think that we can use Horn because it looked at whether or not there was a durable remedy, it required evidence of whether that durable remedy in that case had been satisfied, it, um, it asked the same types of questions that the district court asked below, um, and so whether you apply it here or not, the state simply did not meet its burden. All right. Any other questions? Thank you, Your Honors. All right. Thank you, ma'am. All right. We'll hear from the government. Thank you. May it please the court. Yael Portnick for the United States. This case is about whether the state met Rule 60b-5's high burden for vacater of a final judgment. It was not an abuse of discretion for the district court to find on the record before it that the state had not shown either that it had satisfied the consent judgment or that continued application of the consent judgment would be inequitable going forward. With respect to the first-pronged satisfaction, the state had the burden to show both good-faith substantial compliance with the terms of the decree as well as that it had established a durable remedy, and on the record before it, the district court correctly found that the state had not met that burden. Uh, the Solicitor General argued that there was a durable remedy because the state enacted Act 776, uh, to set the boundaries for District 7, but that was the means to an end. And the items in paragraph C were to accomplish an end, that there would be a durable district anchored in Orleans Parish that would ensure going forward that the voice of black voters was not diluted. And now they came to the district court seeking to undo that remedy. They moved on the eve of a redistricting cycle, saying that they wanted to redistrict, but they refused to show the court the map they wanted to enact it. When asked if they were committed to ensuring the continuation of an Orleans-anchored parish, the attorney for the state flatly refused to make any sort of commitment, and at the same time, the state was arguing in the Middle District of Alabama that Section 2 doesn't even apply to judicial elections, despite the Supreme Court's holding in this very case that it does.  The Middle District of Louisiana. In the Allen case, the state argued that, um, Section 2 doesn't apply to the district court, despite the chiseled holding that it does. So on that record, the district court didn't have anything to give it confidence that the state had instituted a durable remedy. This case is similar to Allen v. State Board of Education in Alabama, where the plaintiffs had argued that, um, teacher certification examinations were discriminatory. And they complied with the consent decree in that case by simply certifying teachers in other manners, rather than requiring examinations for a number of years. They then came to the court saying, we now want to reinstitute a certification examination, and we'd like to do so without being under the confines of the consent decree. And there, the Eleventh Circuit affirmed that it was premature, there was no record of compliance that they could point to, to show that they could require these examinations and comply. Similarly here, because of the unique nature of this case in judicial elections, the state never previously sought to redistrict, although it had the ability to do so under the consent decree. Because the state hasn't previously redistricted, there's no record of compliance that it can do so, while still complying with the purposes of the decree, to ensure that going forward there is an Orleans Anchor District that satisfies Section 2. Therefore, the passage of time alone is not sufficient. The attorney for the state also argued that this case should be diverted by FREW, um, and that action items alone is sufficient to meet its burden. However, FREW is easily distinguishable for a number of reasons. There, although the court didn't use the word, stirable remedy, it did look to see what the consent decree was in that case, and analyzed whether the state had satisfied that objective. In FREW, it wasn't looking at the consent decree holistically. There were 11 corrective action orders that had been entered in 2007, and compliance with each was intended to provide a clear potential endpoint for the obligations under the corresponding part of the consent decree. And it, the court said when it entered those CAOs that each should be assessed term, assessed separately, and could be terminated once those actions were complied with. This court analyzed the preamble to the consent decrees or the CAOs, and said that they didn't guarantee specific outcomes, just certain actions. They were aimed at supporting recipients, addressing concerns, um, fostering the use of healthcare services. Here, the consent judgment was clearly aimed at a future outcome. It was aimed at ensuring that black voters would not have their voting strength diluted in Orleans Parish going forward. So there was a guarantee that there would be an ongoing equal opportunity to elect. There's also no reason to believe that the defendants in FREW would or could undo the reforms that they were required to take. The action items were to conduct surveys, do assessments, provide information or training, but here the state moved on the eve of a redistricting cycle, saying, we want to redistrict, but we won't show you a map that we want to adopt. And so it's a very different circumstance than in FREW. Additionally, um, I'd like to speak quickly to the use below of the desegregation cases for this standard. Um, although this court has not ruled on whether or not those are applicable, the way the district court applied them below was compatible with the substantial compliance standard. The district court interpreted the factors to look at in the desegregation cases as the need to assess whether the state had a compliant and good faith and whether the purpose of the decree has been fulfilled. And that's very much in line with how this court has interpreted substantial compliance and the need for a durable remedy going forward. It's also, um, was reasonable given the dearth of case law and the broad inquiry district courts must undertake, um, in examining Rule 60b-5 motions for the district court to consider those factors here. With, um, respect to the state's argument that all that's left is a requirement that the state follow the law, courts do have broad power to restrain similar acts, um, to the predicate violation that was at issue. Here this isn't a requirement as this court already found in the Allen case that the state comply with Section 2 across the board in all judicial districts. It's nearly tailored to the alleged violation of vote dilution in Orleans Parish. And the district court had an obligation in assessing a Rule 60b-5 motion to ask whether it was satisfied that the state would continue to comply with that purpose. As the First Circuit said in Rufo, it would be a travesty to, um, grant a motion to vacate a consent decree simply to have the original violation repeated. The state doesn't need to meet a high burden, it just simply needs to give the court something to give it confidence that it won't repeat the original violation. If not a map, a commitment, um, their redistricting criteria the legislature enacted in this, in 2021 through a joint rule specifically requires for, um, other state offices and for congressional offices that they be single member districts and that there be equal population. But for Supreme Court districts alone, the state didn't institute any similar requirement. Um, so it calls into question whether malapportionment really is the priority here. If that's what they want to correct, the United States certainly wouldn't object to a map that corrects for malapportionment while still ensuring that there is an equal opportunity district anchored in Orleans Parish. If there are no further questions, the United States respectfully requests that the court affirm the district court's order. All right. Thank you. Okay. Ms. Ahmed for Justice Johnson. May it please the court, Nora Ahmed for Justice Johnson. Only three of the 117 Louisiana Supreme Court justices have been elected by black voting majorities. That's two and a half percent over more than 200 years. At issue is a 1992 judgment that includes provisions A through K and B calls for a voting system that complies with section two of the Voting Rights Act. But over the past 30 years, outside of provision C, no such system has been implemented. And that's a problem because black Louisianians continue to face centuries old discrimination  Less than three years ago, Justice Johnson in State v. Bryant explained that the pig laws of the 1870s, successors to the black codes, persist. She stressed that the pig laws were used to re-enslave black people by targeting them for minor property crimes. As the lone dissenting voice in Bryant, she described how Louisiana's current habitual offender law operates as a modern day pig law because it's sentences black people to life in prison like Mr. Bryant for nothing more than stealing a pair of hedge clippers, silencing voices like Justice Johnson's means that we are silencing voices that explain how this state's laws suffocate black life. That is unconscionable. It is also racist and illegal. The lower court's judgment should be affirmed. All right, thank you. Back to you, Ms. Murrell, for rebuttal. Okay, I want to unpack a few things. I'll start with the last comments and just say that respectfully that those issues are not before this court. This isn't the description of the complaint. The complaint itself was about the split districts in Orleans Parish and the settlement resolves that complaint. And so to explode it into a settlement that is about correcting an entire system is contrary directly to Allen. I mean, Allen described a broad view of this judgment. I'll come back to it because you've got a lot of arguments to push through. The other side seems to say the state may or may not be entitled to relief from the kind of show up, those are my words, and to say, indeed, if you show up and you've got something other than somebody said PowerPoints and present that, I take it they don't argue that the district court could not have relieved the state, but only showing made, I guess is the way I get it, reduced to the slowest terms. So, Your Honor, no one disputes that the state enacted legislation twice to comply with this decree. No one disputes that there was legislation in the recent redistricting that doesn't go back to the old system of splitting the district. No one disputes, I don't think, the general proposition other than potentially the federal government that you cannot simply enjoin a state to follow the law. I think that the absence of action by the state is evidence. The district court seemed to say, well, what else do you have, and you keep seeming to say, well, here are these plans that were drawn up, something you were talking about, the court taking judicial notice. Legislation that was filed in the redistricting session related to judicial redistricting, and specifically to the point of the PowerPoint. The PowerPoint was presented in the legislative session, and it discussed all of the malapportionment, it discussed all of the census numbers, and it specifically has several slides that explain how malapportioned the Supreme Court is. We didn't redistrict until— Their argument, and again, since—their argument is malapportionment has existed for a long time and exists otherwise, and so to say malapportionment is an issue, the state has done nothing to address it. That's not—that's just the way I'm reading at least what's been said, that the malapportionment is an issue, but it exists and has been there, and the state hasn't moved to address malapportionment otherwise. What's your response to that? I think that that is exactly the kind of issue that the Supreme Court talked about in Horne when it says that a court has to respect federalism concerns and not impose these conditions for any longer than they necessarily need to be imposed because new leadership may come in and have a different view of the problem. The problem has been in place for some time, and the length of time that it has occurred only exacerbates the problem more, and there was much made, I think, by the district court about federal law not requiring one-man-one-vote, but that doesn't mean that state law doesn't or that state representatives don't value that as a proposition in the state redistricting process. So the malapportionment of the Supreme Court districts is a problem. It very clearly was identified as a problem, and the PowerPoint illustrates that problem with very—with specificity and with regard to what the malapportionment is across the state. So—and I think the absence of evidence here is evidence. They ask us to prove a negative. They ask us to come back and prove that we are never going to violate Section 2 again in redistricting, and I don't—we have to go through the process. The whole point is we made an agreement. We did the things that we agreed to in that agreement, and we couldn't agree to bind the to come back and keep proving that it's never going to violate the law again if it ever did. I mean, we don't dispute that this was an important case and that it resolved a problem that was brought before the federal courts to resolve. We agreed to a solution and specifically agreed to certain things that would get rid of the problem. They would solve the problem, and they agreed it would solve the problem. We agreed it would solve the problem, and the federal court agreed it would solve the problem. One of the things you identified in the checklist is that Justice Griffin has been elected, so her term goes through 2030, I think. So is it the state's position that if you prevail in this action, that whatever other plans might occur or actions by the legislature, none of that would occur or could affect come into effect until after 2030? Correct. We can't change her term. She's constitutionally entitled to that term. So, I mean, under the state constitution, I think we would have a problem if we ever tried with any justice to end their term prematurely. We can do certain things with regard to new elections. We can't change the term so every justice would complete their term. Whatever other redistricting or whatever else happened really couldn't impact until after 2030. Well, that's right. I mean, we can look at the whole picture, and we can look at what needs to be done to balance the malapportionment that exists. There's never been any suggestion that we were going to go back to any kind of split district in New Orleans, which I would draw the court back to the complaint that this in its precedent that the settlement or the agreement is designed to resolve the complaint, the issues that were raised in the complaint. And so to suggest that this was, and to now suggest that this was about solving the broader, a broader problem of a whole system, I think goes against what Allen decided, and it also goes against the actual complaint that was brought and the settlement that was written. Well, of course, all Allen decided is that whatever else is going on in the middle district goes on in the middle district, and it's not subsumed in this case. I sort of derailed you asking you one other thing. Is there any final point you want to end up on? Only that I think the judge, your honors, that the district court should have asked one question, and that was whether we had satisfied the items that were listed in the decree, and we have. And the court should have approached this from the direction of returning power to the That is the directive that the court is supposed to be following, and in fact, she did exactly the opposite. So I'd ask you to reverse. Your honor, did DeNovo review as a legal matter or abuse of discretion in terms of how the district court handled the 60B questions? DeNovo review of how she interpreted the settlement and abuse of discretion with heightened attention to the overall decision. Thank you. All right. Thank you, counsel. Thank you to all counsel for the briefing and argument in the case. The case will be submitted along with the others. Before we